[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-11397
_____

D.C. Docket No. 1:10-cv-23139-JAL

JANET FELICIANO,

Plaintiff-Appellee,

EDGARDO GONZAGA,

Plaintiff,

versus

CITY OF MIAMI BEACH,
a municipal entity,

Defendant,

LT. ROBERT ACOSTA,
Miami Beach Police Lt., in his individual capacity,
DET. ANDREW DOHLER,
Miami Beach Police Det., in his individual capacity,
DET. DOUGLAS DOZIER,
Miami Beach Police Det., in his individual capacity,
SGT. JAMES NASH,
Miami Beach Police Sgt., in his individual capacity,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(February 5, 2013)

Before CARNES and COX, Circuit Judges, and RESTANI,[*] Judge.

CARNES, Circuit Judge:

At early common law parties and others with an interest in the outcome of litigation were deemed incompetent to testify and barred from the witness stand on the ground that their interest made them unworthy of belief. 2 John H. Wigmore, Evidence in Trials at Common Law §§ 575–77 (Chadbourn Rev. 1979). The idea was similar to the one that H.L. Mencken expressed in another context when he remarked, "It is hard to believe that a man is telling the truth when you know that you would lie if you were in his place." H.L. Mencken, A Little Book in C Major 22 (John Lane Co. 1916). Parties with an interest, it was presumed, would lie.

That presumption and the rule of exclusion it supported were worn down by criticism over time. See, e.g., 5 Jeremy Bentham, Rationale of Judicial Evidence 81 (Fred B. Rothman & Co. 1995) (1827) (describing the rule as "blind and brainless"). As Logan Bleckley, one of Georgia's greatest judges, explained more than a century ago:

_____

[*] Honorable Jane A. Restani, United States Court of International Trade Judge, sitting by designation.

2

> Interest and truth may go together.  Is there, in the world, an honest man who does not know that he can tell the truth against his interest? . . . Where there is impossible doubt as to the effect of villainy upon veracity, the jury ought to be left to decide it.  As coming from the average of society, they know best what to think on such a question.  Interest is a great rascal; but is not an absolute reprobate.  Its doom is not perdition at all events.  It has a chance of salvation.  It is not obliged to commit perjury.

Davis v. Central R.R., 60 Ga. 329, 333 (1878) (Bleckley, J.).  Early in the last century the Supreme Court could say that "what was once regarded as a sufficient ground for excluding the testimony of [an interested witness] altogether has come to be uniformly and more sensibly regarded as affecting the credit of the witness only."  Funk v. United States, 290 U.S. 371, 380, 54 S.Ct. 212, 215 (1933). On claims subject to trial by jury, issues about whether to credit the testimony of a witness, interested or not, are for the jury.  See Moughon v. State, 57 Ga. 102, 106 (Ga. 1876) (Bleckley, J.) ("What shall come to the jury as evidence, is for the court.  What it is worth when it arrives, is for the jury.  They can discern its true value with spare assistance from the bench.").

Federal Rule of Civil Procedure 56 and countless decisions applying it express the modern rule that a case should be put to the jury if there is any genuine issue of material fact, including one created solely by the testimony of a party. See, e.g., Strickland v. Norfolk S. Ry. Co., 692 F.3d 1151, 1160 (11th Cir. 2012); Hulsey v. Pride Restaurants, LLC, 367 F.3d 1238, 1247 (11th Cir. 2004); Stewart v. Booker T. Washington Ins., 232 F.3d 844, 850 (11th Cir. 2000).  Occasionally

3

there is pushback against this rule, sometimes expressed in orders granting summary judgment despite what is described as the non-movant's "unsubstantiated" or "uncorroborated" or non-objective testimony.  At other times we have seen summary judgment based on disapproval of a party's testimony as "conclusory" when it is not.  There appears to have been some of that in this case, although the district court did reach the right result anyway.

## I.

Police officers Robert Acosta, Andrew Dohler, Douglas Dozier, and James Nash appeal the district court's denial of their motion for partial summary judgment on Janet Feliciano's 42 U.S.C. § 1983 unlawful search claim. Feliciano's claim alleges that those four officers violated her Fourth Amendment rights when they conducted a warrantless entry into her home and searched it.  The district court denied the defendant officers qualified immunity on the claim, reasoning that although their initial entry did not violate Feliciano's clearly established Fourth Amendment rights, they plainly exceeded constitutional bounds when they searched, among other things, her underwear drawer and kitchen pantry. The officers contend that the district court erred in denying them qualified immunity because the scope of their search did not violate Feliciano's clearly established constitutional rights.

We review <u>de novo</u> a district court's denial of summary judgment based on qualified immunity, applying the same legal standards that governed the district court. <u>Edwards v. Shanley</u>, 666 F.3d 1289, 1292 (11th Cir. 2012). Summary judgment is appropriate when the record evidence, including depositions, sworn declarations, and other materials, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). In conducting our review, "we are required to view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." <u>Skop v. City of Atlanta, Ga.</u>, 485 F.3d 1130, 1143 (11th Cir. 2007) (quotation marks omitted). Thus, "when conflicts arise between the facts evidenced by the parties, we [must] credit the nonmoving party's <u>version</u>." <u>Evans v. Stephens</u>, 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc). Although the "facts," as accepted for purposes of summary judgment, may not be the actual facts of the case, "our analysis . . . must begin with a description of the facts in the light most favorable to the plaintiff" and our decision must accept those facts. <u>Davis v. Williams</u>, 451 F.3d 759, 763 (11th Cir. 2006).

## II.

Aside from the time, place, and persons involved in the incident giving rise to this case, the parties' accounts of the material events differ. At this stage of the

proceedings we are required to credit Feliciano's version if there is any evidence to support it, and it is that version we set out here.

In August 2006, the Miami Beach Police Department received a confidential tip from one of Feliciano's neighbors. According to that tip, a couple living at Feliciano's apartment were possibly drug dealers and had three small children in the household.[1] Responding to that tip, narcotics officers Acosta, Dohler, Dozier, and Nash went to Feliciano's apartment at around 9:00 p.m. on September 2, 2006, to investigate. Feliciano, who was five to eight weeks pregnant at the time, was inside the apartment with her domestic partner, Edgardo Gonzaga, and their three children, aged 7, 6, and 4. Feliciano's eldest son answered the officers' knock on the door by opening it a little. When Feliciano came to the doorway, the officers identified themselves, informed her that they had received an "anonymous" tip that drugs were being sold out of her apartment, and asked if they could come inside

---

[1] The signed letter submitted to the police stated:

> As a neighbor on Crespi Blvd., I am concerned about the following situation. There is a lot of activity (drugs?) that occurs in the section 8 housing unit at 8235 Crespi Blvd., Miami Beach, I believe #1(?) (the apartment closest to the street). I believe the female living there, along with her husband, are active drug dealers. People come and go at all hours of day and night, and there are many loud disputes and fights. Neighbors are scared of them. With the three small children in the household, it is especially dangerous for the welfare of not only those children, but others on this block.

Feliciano filed a motion in the district court to exclude the allegations in the neighbor's tip because the officers failed to timely disclose its existence under Fed. R. Civ. P. 26(a). Although the district court has yet to formally rule on Feliciano's motion, it implicitly overruled her request for purposes of summary judgment by considering the contents of the neighbor's tip in its decision. We need not decide whether the district court abused its discretion in doing so because the contents of the tip do not affect the result of this appeal. See infra pp. 19–20.

and search it. Feliciano disputed the accuracy of the tip and told the officers that they could not come inside without a search warrant. Officer Dohler replied that the officers didn't need a search warrant because Feliciano had a religious candle burning in her window, which presented a fire hazard justifying the removal of her children from the home. (The officers have not repeated that assertion since then.)

Around this time, Gonzaga came walking out of the back bedroom where he had been watching television. When the officers spotted him, they pushed their way through the door and rushed into the apartment. Acosta grabbed Feliciano's neck, forced her towards the living room couch, held her arms behind her back, and began repeatedly slamming her stomach into the wooden side arm of the couch. Although Feliciano begged Acosta to stop because she was asthmatic, pregnant, and didn't want any harm to come to her unborn child, Acosta ignored her pleas and continued to ram her stomach into the arm of the couch. Officer Nash, who was standing beside Acosta and Feliciano, did not intervene.

While Acosta was restraining Feliciano, Dohler and Dozier grabbed Gonzaga by the neck and, when Feliciano's eldest son ran near, one of the officers grabbed the child by the shoulder and threw him against the wall. Following a brief struggle, Dohler and Dozier handcuffed Gonzaga. Acosta then allowed Feliciano to sit on the couch and comfort her three children. Without the consent of either Feliciano or Gonzaga, Acosta, Dohler, and Dozier proceeded to search the

7

residence, rifling through Feliciano's underwear drawer in her bedroom, the medicine cabinet in the bathroom, and the cabinets and pantry in the kitchen. One of the officers eventually emerged from the kitchen holding what he claimed was a half of a marijuana joint that he claimed to have discovered. Gonzaga remarked "that's not my weed," but was soon escorted out of the apartment on misdemeanor charges of resisting arrest without violence, possession of cannabis, and possession of drug paraphernalia. After the officers left, Feliciano experienced stomach cramping and vaginal bleeding. She went to the emergency room the next day and learned that she had suffered a miscarriage.

In his arrest report, completed after the incident, Acosta stated that the officers noticed the smell of marijuana emanating from Feliciano's apartment after she opened the door and as they were explaining to her the reason they were there. The report also indicated that Gonzaga was "smoking a joint" as he emerged from the bedroom, tried to conceal the joint as soon as he saw the officers standing outside, and then dropped it and attempted to run out of the apartment. The officers reportedly recovered the joint and also found a small amount of cannabis and rolling papers in Gonzaga's pocket during a search incident to arrest. Acosta indicated in his report, however, that it was unknown whether Gonzaga was under the influence of drugs.

Gonzaga was formally charged with resisting arrest, possession of marijuana, and possession of drug paraphernalia, but the charges were later dismissed because no officer appeared in court.  The alleged marijuana that the officers claimed to have seized at the apartment was never tested and has since been destroyed.

### III.

Feliciano filed a fifteen-count amended complaint against the City of Miami Beach and the four officers in their individual capacities, asserting numerous constitutional claims for excessive force and unlawful search and seizure, as well as several state-law tort claims.  In Count Six of the complaint, which is the only claim at issue in this appeal, Feliciano alleged that the officers violated her Fourth Amendment rights when they entered her home without a warrant and searched the premises.  The officers moved for partial summary judgment on a number of the claims, including the one asserted in Count Six.  They maintained that they were entitled to qualified immunity on that claim because the warrantless entry and resulting search of Feliciano's apartment were justified by probable cause and the presence of exigent circumstances—namely, the need to prevent the destruction of drug evidence and to otherwise ensure that there were no drugs "within the plain grasp" of Feliciano's children.  Officer Nash also maintained that he was entitled

9

to qualified immunity because he did not personally participate in the search of Feliciano's bedroom, bathroom, or kitchen.

The officers based their defense of qualified immunity, in large measure, on Acosta's arrest report and his deposition testimony. During his deposition, Acosta testified, in relevant part, that he smelled marijuana emanating from Feliciano's apartment when the officers first approached the residence and before they knocked on the door. Acosta also testified that he saw Gonzaga smoking a joint as he walked out of the bedroom "with slits for eyes," and that Gonzaga attempted to conceal the joint by lowering his right hand and hiding it in his palm. Feliciano, in both her deposition testimony and sworn declaration, adamantly disputed the officers' account, testifying that Gonzaga had nothing in his hands when he emerged from the bedroom, that neither she nor Gonzaga was smoking marijuana, and that there was no marijuana smell in the apartment when the officers arrived. She also testified that there was no marijuana in her apartment before the officers arrived and began their search. Gonzaga was not deposed.

The district court rejected the officers' claims for qualified immunity, but solely on the ground that the scope of their search, particularly of the underwear drawer and kitchen pantry, violated Feliciano's clearly established Fourth Amendment rights because it plainly exceeded constitutional bounds, including the

demands of any apparent exigency.[2]  The court concluded that the officers did not

violate clearly established law when they entered Feliciano's apartment without a

warrant.  Its reasoning was that the officers had arguable probable cause and faced

arguable exigent circumstances given the "effectively undisputed evidence" that

they smelled marijuana coming from the apartment and saw Gonzaga holding a

joint.  Although the court acknowledged Feliciano's testimony to the contrary, it

found that her "bare assertions" were insufficient to create a genuine issue of fact

about the officers' observations because her testimony was "conclusory" and

unsupported by any objective evidence.  Accepting the officers' assertions that

they smelled and saw marijuana, the district court found that arguable probable

cause and arguable exigent circumstances justified their immediate entry into

Feliciano's home, without her consent, in order to arrest Gonzaga and to prevent

the possible destruction of drug evidence.

## IV.

The officers contend that, while the district court correctly concluded that

arguable probable cause and arguable exigent circumstances justified their

warrantless entry into Feliciano's home, the court erred in concluding that they

exceeded the scope of a permissible search by looking through her underwear

---

[2] The district court did not address Nash's contention that he was entitled to qualified immunity because he did not personally participate in the search of Feliciano's apartment.  See infra p. 20.

11

drawer and pantry.  They argue that the entry and search of Feliciano's apartment was supported not just by arguable probable cause but also by actual probable cause given the "undisputed" evidence that they had received a tip from a neighbor that the couple residing in Feliciano's apartment was selling drugs; they smelled marijuana when they approached the apartment; when the door was opened, they observed Gonzaga coming out of the bedroom with a joint that he attempted to conceal; and they found marijuana and rolling papers on him during a search incident to arrest.  On the specific issue of exigent circumstances, the officers argue that once they saw Gonzaga with the marijuana joint they were justified in searching the apartment, including in drawers and cabinets, for additional drugs because they reasonably believed that Feliciano would attempt to destroy any remaining drug evidence and they were also otherwise concerned that there might be readily accessible drugs that posed a risk to the safety of the children.[3]

---

[3] Feliciano maintains that we lack jurisdiction over this interlocutory appeal because the officers' challenge to the denial of qualified immunity centers on a number of disputed issues of material fact, including whether they actually smelled marijuana coming from the apartment, saw Gonzaga holding a joint, or found marijuana that was already in her home before their arrival. Although we do lack interlocutory jurisdiction under 28 U.S.C. § 1291 when the only issues appealed in a qualified immunity case are evidentiary issues about which facts a party may, or may not, be able to prove at trial, we have jurisdiction where the district court's denial of qualified immunity is based, even in part, on a question of law. Crenshaw v. Lister, 556 F.3d 1283, 1288–89 (11th Cir. 2009); Cottrell v. Caldwell, 85 F.3d 1480, 1484–85 (11th Cir. 1996). And that includes the district court's determination in this case that the officers were not entitled to qualified immunity under a given set of facts. See Cottrell, 85 F.3d at 1484–85. Moreover, in the course of deciding such an interlocutory appeal, we may resolve any factual issues that are "part and parcel" of the core legal issues. Id. at 1486. The requirement that the evidence be viewed in the light most favorable to the plaintiff can itself create an issue of law. Id. at 1486 n.3. We do have jurisdiction over this appeal.

A.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. The "chief evil" against which the Fourth Amendment is directed is a government agent's warrantless entry into a person's home. Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379 (1980). A warrantless and nonconsensual entry into a person's home, and any resulting search or seizure, violates the Fourth Amendment unless it is supported by both probable cause and exigent circumstances. See id. at 587–90, 100 S.Ct. at 1381–82; United States v. Tovar-Rico, 61 F.3d 1529, 1534–35 (11th Cir. 1995); United States v. Tobin, 923 F.2d 1506, 1510 (11th Cir. 1991) (en banc).

Probable cause to arrest exists when the facts and circumstances within an officer's knowledge are "sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime," Skop, 485 F.3d at 1137, while probable cause to search requires a "fair probability that contraband or evidence of a crime will be found in a particular place," Tobin, 923 F.2d at 1510 (quotation marks omitted). Exigent circumstances, in turn, arise when "the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." United States v. Burgos, 720 F.2d 1520, 1526 (11th Cir. 1983). We have held that the "presence of contraband without more does not give rise to exigent

13

circumstances," though an exigent circumstance may arise "when there is danger that the evidence will be destroyed or removed." Tobin, 923 F.2d at 1510 (quotation marks omitted). The exigency question is whether the facts would lead an objectively "reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured." Id. (quotation marks omitted).

Nevertheless, in cases involving arrests or warrantless searches or seizures, law enforcement officers are entitled to qualified immunity if they had even arguable probable cause.[4] See Swint v. City of Wadley, Ala., 51 F.3d 988, 996 (11th Cir. 1995); Eubanks v. Gerwen, 40 F.3d 1157, 1160 (11th Cir. 1994). Arguable probable cause exists if "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed." Swint, 51 F.3d at 996 (quotation marks omitted).

## B.

We agree with the district court's ultimate conclusion that the officers are not entitled to summary judgment on Feliciano's Fourth Amendment claim on the basis of qualified immunity, though not for the same reasons articulated by the district court. See Parks v. City of Warner Robins, Ga., 43 F.3d 609, 613 (11th

---

[4] The initial inquiry in a qualified immunity case is whether the government officials being sued were "acting within the scope of [their] discretionary authority when the allegedly wrongful acts occurred." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (quotation marks omitted). Here, there is no dispute that the defendants were acting within their discretionary authority when they entered and searched Feliciano's residence.

Cir. 1995) ("[W]e may affirm the district court's [summary judgment] decision on any adequate ground, even if it is other than the one on which the court actually relied.").  Instead, we conclude that, given the facts as we must view them for purposes of summary judgment, the officers lacked even arguable probable cause or exigent circumstances justifying their entry into Feliciano's apartment without a warrant or her consent.[5]

In concluding that the warrantless entry of Feliciano's apartment did not violate her clearly established Fourth Amendment rights, the district court improperly discounted her sworn statements about what the officers could have observed before they entered the apartment, failed to construe the facts in the light most favorable to her, and impermissibly credited the officers' assertions that they

---

[5] The officers contend that we lack jurisdiction to consider whether the initial entry into Feliciano's apartment was unconstitutional because the district court resolved that specific issue in their favor and they have not raised that issue in their notice of appeal or initial brief.  They are wrong about that.  Under Fed. R. App. P. 3(c)(1)(b), we have jurisdiction to review any judgments, orders, or parts thereof that are designated in a notice of appeal.  See Fed. R. App. P. 3(c)(1)(b); White v. State Farm Fire and Cas. Co., 664 F.3d 860, 863–64 (11th Cir. 2011).  The officers' notice of appeal expressly designates the denial of summary judgment "on the 42 U.S.C. § 1983 unlawful search claim in Count 6 of the Second Amended Complaint."  In Count 6, Feliciano claimed that both the initial entry and search of her apartment violated the Fourth Amendment.

Moreover, on de novo review of a summary judgment ruling, we may not only affirm on any ground supported by the record, see Parks, 43 F.3d at 613, but may also choose to disregard a district court's determination of the facts for summary judgment purposes and determine those facts ourselves, see Cottrell, 85 F.3d at 1486 (noting that, "[i]n exercising our interlocutory review jurisdiction in qualified immunity cases," we may either "accept the district court's [factual] findings, if they are adequate," or "make our own determination of the facts").  Although the officers understandably do not challenge the district court's ruling in their favor concerning the initial entry, they do contend, as their position requires them to do, that the ruling was correct.

15

noticed the smell of marijuana coming from the apartment and saw Gonzaga smoking or holding a joint. When considering a motion for summary judgment, including one asserting qualified immunity, "courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party and when conflicts arise between the facts evidenced by the parties, [they must] credit the nonmoving party's version." Davis, 451 F.3d at 763 (quotation marks and emphasis omitted). Even if a district court "believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices." Miller v. Harget, 458 F.3d 1251, 1256 (11th Cir. 2006). This is because credibility determinations and the weighing of evidence "are jury functions, not those of a judge." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 (1986).

Despite those fundamental precepts, the district court accepted "as uncontroverted" and "effectively undisputed" the officers' assertions that before entering the apartment they smelled marijuana and saw a joint in Gonzaga's hand, and the court dismissed Feliciano's testimony directly to the contrary as "bare," "conclusory," and unsupported by objective evidence. The court based its ruling on our statement in Kingsland v. City of Miami, 382 F.3d 1220, 1227 n.8 (11th Cir. 2004), that "a court need not entertain conclusory and unsubstantiated

16

allegations of fabrication of evidence."[6]  See also Cooper v. Southern Co., 390

F.3d 695, 745 (11th Cir. 2004) (holding that summary judgment was appropriate

where the plaintiff relied on conclusory assertions that were based entirely on her

own subjective beliefs), overruled on other grounds, Ash v. Tyson Foods, Inc., 546

U.S. 454, 457–58, 126 S.Ct. 1195, 1197–98 (2006); Stewart, 232 F.3d at 851

(holding that "bare and self-serving" allegations that are not based on personal

knowledge are inadequate to survive summary judgment).

But Feliciano's sworn statements that Gonzaga was not holding anything in

his hands when he emerged from the bedroom into the officers' view, that neither

she nor Gonzaga was smoking marijuana, and that there was no marijuana odor in

the apartment are not conclusory.  They are non-conclusory descriptions of

specific, discrete facts of the who, what, when, and where variety.  They describe

the external world as Feliciano observed it at the time and are based on her first-

hand personal knowledge, not her subjective beliefs.  And they directly contradict

the officers' assertions about what they observed before and after they entered the

apartment.  The contradiction presents a classic swearing match, which is the stuff

of which jury trials are made.

---

[6] Kingsland actually reversed a grant of qualified immunity to officers on a Fourth
Amendment claim for false arrest, which makes the quoted statement dicta, though we do not
dispute the correctness of that statement.  See Kingsland, 382 F.3d at 1231–34; see also United
States v. Kaley, 579 F.3d 1246, 1253 n.10 (11th Cir. 2009) (explaining that dicta includes "those
portions of an opinion that are not necessary to deciding the case then before us," while the
holding of a case is "comprised both of the result of the case and those portions of the opinion
necessary to that result") (quotation marks omitted).

17

To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage. As we stated in Price v. Time, Inc., 416 F.3d 1327, 1345 (11th Cir. 2005), "[c]ourts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving." Or as Justice Bleckley put it, the law allows that "[i]nterest and truth may go together." Davis, 60 Ga. at 333. Besides, Feliciano's sworn statements are no more conclusory, self-serving, or unsubstantiated by objective evidence than the officers' assertions that they smelled marijuana coming from her apartment and saw Gonzaga smoking or holding a joint. While it is undisputed that Gonzaga was arrested and charged with possession of marijuana, those charges were dismissed after none of the officers appeared in court, and there is no physical evidence, at least none that survives, to show that marijuana was present in Feliciano's apartment. The substance that the officers purportedly seized was never tested and has long since been destroyed. And Feliciano's interest in obtaining a judgment against the officers is not different in kind from their interest in preventing her from doing that.

The officers fault Feliciano for failing to explain how she could see what Gonzaga was holding in his hands (or not holding in his hands according to her) because, they say, she was facing and speaking to them at the time. As a general principle, a plaintiff's testimony cannot be discounted on summary judgment

18

unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature.  See Scott v. Harris, 550 U.S. 372, 380–81, 127 S.Ct. 1769, 1776 (2007) (holding that a court should not adopt a party's version of the facts when it is "blatantly contradicted by the record" in the form of videotaped evidence); Holley Equip. Co. v. Credit Alliance Corp., 821 F.2d 1531, 1537 (11th Cir. 1987) (concluding that a plaintiff's testimony could not be disregarded on summary judgment because the discrepancies in that testimony were not "incredible as a matter of law" or "blatantly inconsistent"); United States v. Flores, 572 F.3d 1254, 1263 (11th Cir. 2009) (noting that testimony is only incredible as a matter of law "if it relates to facts that the witness could not have possibly observed or events that could not have occurred under the laws of nature") (quotation marks omitted).  There is nothing in the record in this case to rule out the possibility that Feliciano turned her head or body, momentarily, to look at Gonzaga as he walked out of the bedroom.   The officers imply that she did not, but Feliciano's testimony implies that she did.

        In affirming the grant of summary judgment against the officers, we have not forgotten about the tip supplied by the neighbor, which brought the officers to the apartment to begin with.  Whether an informant's tip can give rise to probable cause or arguable probable cause depends on the totality of the circumstances,

particularly the informant's veracity, reliability, and basis of knowledge, as well as any independent corroboration of the details of the tip. Ortega v. Christian, 85 F.3d 1521, 1525 (11th Cir. 1996). We need not go into all of that because the officers conceded at oral argument that the tip alone was not enough to justify their entry into the apartment or their search inside it, and we accept that concession for purposes of this case.

Nor have we forgotten Nash's argument that he is entitled to summary judgment because he did not personally participate in the search once inside the apartment. Part of Feliciano's claim, however, is that the officers, including Nash, "forcibly entered and invaded [her] home" in violation of her Fourth Amendment rights. The evidence, viewed in the light most favorable to Feliciano, shows that Nash, as well as the other officers, did that. See Kirk v. Louisiana, 536 U.S. 635, 638, 122 S.Ct. 2458, 2459 (2002) (emphasizing that "the Fourth Amendment has drawn a firm line at the entrance to the house," such that "police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home") (quotation marks omitted). We affirm the denial of summary judgment to Nash as well as to the other officers.

V.

For these reasons, we affirm the district court's denial of summary judgment on the basis of qualified immunity, albeit for reasons other than those upon which it relied.

**AFFIRMED.**